## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Criminal No. 1:23-CR-133** |
| **KYLE BLANCO** | ) | |
| | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Kyle Blanco, by and through undersigned counsel, respectfully files this Memorandum in Aid of Sentencing. Mr. Blanco comes before this Honorable Court both humbled and contrite following his acceptance of responsibility upon entering a plea of guilty to one (1) count of Possession of Child Pornography, in violation of 18 USC § 2252(a)(4)(B) and (b)(2), and Voyeurism, in violation of D.C. Code § 22-3531(b)(1) and (f)(1). *See generally* PSR.

Mr. Blanco deeply regrets the choices he made that have brought him before this Court. Mr. Blanco is twenty-one (21) years old and was born on March 22, 2002 in Trenton, New Jersey.[1] *See* PSR ¶ 55. He is the only child to his parents and reported having a "normal, happy childhood." *Id.* at ¶ 55-56. Growing up, Mr. Blanco's grandparents lived with his family and they enjoyed a close relationship. *Id.* at ¶ 57. His mother explained that their family was always really close – attending church, engaging in family activities, and going on vacations together. *Id.* at ¶ 56. Mr. Blanco's mother also described him as a "good kid," who is "respectable" and "trustworthy." *Id.* at ¶ 58. His mother wishes for her son to be placed in treatment so he can continue pursuing his education. *Id.* She assures, "We will take responsibility for him and will be watching him." *Id.*

---

[1] Mr. Blanco will turn twenty-two (22) shortly after the submission of this Memorandum.

Based upon Mr. Blanco's personal history and character, the nature and circumstances of the offense, his age, ███████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████ Such a sentence would be "sufficient, but not greater than necessary" to achieve the legitimate purposes of sentencing, particularly in light of Mr. Blanco's medical diagnoses. *See* 18 U.S.C. § 3553(a).

## I.    THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *Id.* at 51; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).   The Court must "consider all of the  § 3553(a) factors," "make an individualized assessment based on the facts presented," *Gall* at 49-50, and explain how the facts relate to the purposes of sentencing.  *Id.* at 53-60; *See also Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011).  The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough* at 101; *Pepper* at 1242-43.

In order to ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . ., as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*. at 101-02 (internal punctuation omitted) (*citing Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district

courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper* at 1240 (citing *Wasman v. United States*, 468 U. S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006). Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

## II.     THE U.S. SENTENCING GUIDELINES

In accordance with the Plea Agreement in this matter, the parties agreed that the following Sentencing Guidelines sections apply:

**2023 Guidelines**

USSG § 2G2.2(a)(1) – Base Offense Level                                        18

USSG § 2G2.2(b)(2) – Material involved depiction of a prepubescent minor        +2

USSG § 2G2.2(b)(6) – Use of a computer                                        + 2

USSG § 2G2.2(b)(7) – Number of images                                          +5

| | | |
|---|---|---|
| USSG § 3C1.1 – Obstructing or Impeding the Administration of Justice | | +2 |
| | Total | 29 |
| Acceptance of Responsibility USSG §3E1.1(a) | | -2 |
| Acceptance of Responsibility USSG §3E1.1(b) | | -1 |
| **TOTAL OFFENSE LEVEL** | | **26** |

Mr. Blanco has a criminal history score of zero (0) and a criminal history category of I for sentencing purposes. *See* PSR ¶ 8, 48. These calculations, with a total offense level of 26, would result in an advisory Guidelines range for Mr. Blanco of 63 to 78 months, and an applicable fine range of $25,000 to $250,000. *See* USSG Sentencing Table; *see also* PSR ¶ 8.

However, there is a difference in guidelines calculations between the Plea Agreement and the PSR. As the government discusses in their memorandum, the government failed to include the four (4) point enhancement found in USSG § 2G2.2(b)(4). If this enhancement is applied, the Adjusted Total Offense Level would be thirty-three (33), and the Total Offense Level would be a level thirty (30) after acceptance of responsibility. This results in a corresponding Guidelines range of 97-121 months. *See* Dkt. No. 31, p. 4, fn. 4; *see also* PSR, ¶ 90. Nevertheless, the government is recommending a sentence at the high end of the Guidelines range as originally contemplated by the Plea Agreement – 78 months.

Mr. Blanco respectfully objects to the imposition of the additional sentencing enhancement referenced in the PSR.  Applying the sadistic/masochistic Specific Offense Characteristic to the image described in the PSR is an overbroad interpretation of the enhancement and should not be applied in this case.

**III.     THE CURRENT USSG FRAMEWORK FOR POSSESSION OF CHILD PORNOGRAPHY ARE DEEPLY FLAWED AND INCONSISTENT WITH THE STATUTORY PURPOSE OF 18 U.S.C. § 3553.**

4

### a. Widespread Disagreement with the Child Pornography Guidelines is Evidence that they are Flawed.

The current guidelines for possession of child pornography have received little support from the federal bench. In early 2010, the USSC surveyed federal judges about the federal guidelines sentencing system. Troy Stabenow, *A Method for Careful Study:  A Proposal for Reforming the Child Pornography Guidelines*, 24 Fed. Sent'g Rep. 108, 108-109 (2011) [Stabenow, *A Method for Careful Study*]. For nearly all types of crimes, the majority of judges agreed that the guidelines were generally appropriate. *Id*. at 109.  For example, 83% of judge believed the guidelines for assault are generally appropriate, and 85% of judges believed the guidelines for *production* of child pornography are generally appropriate or even lenient. *Id*. However, 70% of judges believed the guidelines for *possession* of child pornography (USSG §2G2.2) are too harsh. *Id*.

This dissatisfaction with the guidelines helps to explain the high rate of below-guidelines sentences under USSG § 2G2.2. According to one of the most recent sentencing statistics released by the USSC in 2023, under USSG § 2G2.2, 59.6 % of sentences imposed a variant sentence.[2] "[I]t is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance," *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008).

The guidelines for possessing child pornography were first promulgated in 1991 with a much lower base offense level of ten (10).[3] Since that time, the base offense level has risen by eight (8) levels to an eighteen (18), with numerous additional specific offense characteristics. *Id*.

---

[2] *See* FY 2023, U.S. Sentencing Commission Quarterly Data Report (Through September 2023) *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_4th_FY23.pdf

[3] *See* U.S. Sentencing Commission: The History of Child Pornography Guidelines (October 2009); *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf

An examination of the successive increases in the guidelines, and the purported rationale used to justify these increases, reveals why the majority of judges choose to impose sentences below guidelines.

### b. Congress Relied on Flawed Assumptions When Directing the U.S.S.C. to Increase the Guidelines for Child Pornography Offenses

The increases in Mr. Blanco's guideline calculation are based on changes made directly by Congress itself and on actions taken by the Sentencing Commission at the direction of Congress. While Congress did not make any formal findings of support for any of these actions, its reasons can be gleaned from the legislative history. The history suggests that Congress acted based on three primary beliefs: (1) child pornography possessors are pedophiles who use pornography to sexually abuse children; (2) increasing penalties for possessors will dry up the market and thereby prevent the sexual abuse of children by removing the market incentive for the producers of child pornography; and (3) severe penalties will effectively deter others from possessing child pornography. Each of these beliefs is refuted by current empirical evidence.

### 1) The Mistaken Belief That Possessors Of Child Pornography Are Pedophiles Who Seek To Molest Children

In 1991, Congress directed the Commission to increase the base offense level from 10 to 13, acting on the belief that those who possess child pornography are child molesters who use pornography to coerce, desensitize, and prey upon children.[4] In 1995, Congress directed the Commission to again increase the base offense level, from 13 to 15, focusing on "predatory pedophiles" who use and distribute child pornography to satisfy perverse sexual desires. 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley). In 1998, Congress directed the Commission to

---

[4] *See, e.g.*, 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (stating that "child pornography plays a central role in child molestations by pedophiles" and is "directly connected to child molestation"); *id*. at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) ("[T]hose who receive child pornography through the mails are often also involved in the actual sexual abuse of children – or at the very least meet the psychological profile of those likely to engage in molesting children.").

expand the definition of "distribution" to target stalkers and abductors who use child pornography to lower the inhibitions of potential targets. *See* 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch). Each time it directed the Commission to increase the penalties for possessing child pornography, Congress maintained it was a means to protect children from active sexual abusers or potential sexual abusers. Under this approach, Congress sought to punish possessors of child pornography as a proxy for punishing child sex abusers.

Current research directly undermines this position. In brief, "the evidence to date strongly and rather consistently shows that child pornography consumption does not itself represent a risk factor for contact sexual crimes." Melissa Hamilton, *The Child Pornography Crusade and Its Net-Widening Effect*, Cardozo L. Rev. Vol. 33, at 241. (2012). In fact, "multiple studies show that child pornography offenders are at a much lower risk for contact sexual offending than previously known contact offenders." *Id*. at 242. Moreover, studies show that a finding of pedophilia "is not synonymous with either contact sexual abuse or child pornography." *Id*. at 196. [5] The Commission itself has also recognized this fact, noting not all child pornography offenders are pedophiles or

---

[5] Several courts have noted the misplaced conflation of possession of child pornography with actual child molestation. *See United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) (rejecting presumption that "those who view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation"); *United States v. Kelly*, 868 F. Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting government's argument that guideline range is appropriate because of the "chance that [defendant] will molest children in the future, or that he has in the past," as this "speculation is directly contrary to submissions by Kelly's therapist and Kelly's psychiatrist," the defendant "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis.*"); United States v. Grober*, 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), aff'd 624 F.3d 592 (3d Cir. 2010).

engage in other sex offending." U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012), 104 ["*Child Porn Report*"][6].

Similarly, there is no evidence that the number of images possessed bear on the likelihood that an offender is a child molester. The current sentencing guidelines and most enhancements for possession of child pornography were promulgated at a time when offenders typically received or distributed child pornography in "hard copy," prior to technological changes that "fundamentally changed the manner in which child pornography offenses are committed." *Child Porn Report* at 5-6. The number of images chosen by Congress in its table is arbitrary, and so low that "the majority of defendants receive the highest possible enhancement." *Kelly*, 868 F. Supp. 2d at 1209. With the Internet and file-sharing programs, "it takes only marginally more effort to collect 10,000 images than it does to collect ten." Stabenow, *A Method for Careful Study*, at 124.

The Sentencing Commission has now acknowledged that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography," *Child Porn Report* at 6, and that as the result, the current enhancement for number of images "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," and is overly severe for some offenders. *Id*. at 323. It also recommends that the enhancement be updated to account for "the number of unique, as opposed to duplicate, images possessed by an offender." *Id*. The Commission confirms that the enhancement for number of

---

[6] In February 2013, the Sentencing Commission released a report to Congress on the sentencing guidelines for non-production child pornography offenders, such as Mr. Blanco. The report was compiled in large part due to the high and growing rate of below-guidelines sentences for offenders sentenced under USSG § 2G2.2. The Commission ultimately recommended that many of the enhancements, including those for distribution, use of a computer, and volume of images "be updated to account more meaningfully for the current spectrum of offense behavior… [and] to reflect offenders' use of modern computer and Internet technologies." U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012), xvii-xix, 322-323.

images possessed is "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id*. at 204. Simply put, the "number of images" enhancement is outdated, does not effectively differentiate between different types of offenders, and does not correspond to the dangerousness of the offender or to the magnitude of his conduct.

### 2) *The Mistaken Belief That Severe Punishment For Possession Of Child Pornography Will Dry Up The Market And Prevent The Abuse Of Children*

In initially criminalizing the possession of child pornography, Congress acted on the view that those "who possess and view" child pornography represent the "market" for the production of child pornography, and that punishing child pornography possessors will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr. 20, 1990) (Senator Thurmond). It relied on this same view when it directed the Commission to increase the base offense level in 1991. *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child porn if we want to stop child molestations and put a dent in the child porn trade."). And when it directed the Commission to add the 2-level enhancement for use of a computer, Congress was concerned with deterring the online distribution and trade of child pornography. 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Hatch) (purpose was to "increase[e] penalties for the use of computers in connection with the distribution of child pornography," in part to "ensure that [the information super] highway is not littered with the debris of child pornography"); *see also id*. (Senator Grassley) (purpose was to "discourage child pornographers from using computers to trade in child pornography").

Again, Congress was mistaken. The production, trading, and viewing of child pornography unfortunately takes place around the globe, and there is nothing to suggest that more severe penalties for possession offenses in the United States "dries up" the market in any significant way. Many countries around the world either do not have laws aimed at child pornography or lack the

legal framework to combat these offenses, and of those that do, many do not criminalize the simple possession of child pornography. *See* John Carr, Commonwealth Internet Governance Forum, *A Joint Report on Online Child Protection Combatting Child Pornography on the Internet* (2010). The market is decentralized, not organized, and is mostly comprised of amateur collectors who can freely and easily obtain images, *see* United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* 13 (2010) ["UNDOC, *Globalization of Crime*"], and thus does not operate by the ordinary rules of supply and demand.  In this context, severe punishment of a marginal consumer can have little impact on the proliferation of child pornography on the Internet. The Sentencing Commission itself now acknowledges that there is no social science research to support the theory that criminal punishment affects the child pornography markets since the advent of the Internet. *Child Porn Report* at 98.

Most importantly, there is no empirical evidence to support the assumption that children are abused for the sole or primary purpose of creating child pornography for dissemination. UNDOC, *Globalization of Crime* at 214 ("[I]n most cases, the images are generated as a result of the abuse, rather than the abuse being perpetrated for the purpose of selling images."); *see also* Janis Wolak et al., "Arrests for Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies," 16 Child Maltreatment 184, 192-93 (2011) (The data "suggest that online distribution often was not a motivation for [child pornography] production.").  Even Congress has since recognized that "the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children." Pub. L. No. 108-21, § 501 (2003).

Accordingly, several courts have found that there is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *United States v. Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 (noting that while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."); *United States v. Stern*, 590 F. Supp. 2d 945, 952 n.5 (N.D. Ohio 2008) ("The Court is … forced to note the somewhat limited impact of domestic prosecution for a fundamentally international crime. . . . [N]o court should be deluded into believing that limiting domestic consumption alone can eradicate the international market for child pornography."); *Kelly*, 868 F. Supp. 2d 1202, 1207 ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet, or deterred 'hands-on' abuses against children. To the contrary, while prosecutions of child pornography have skyrocketed, prosecutions of actual sexual abuse of children have remained constant."). They recognize that possessing even large numbers of images does not affect the market. *Id*. ("[T]he tragic realities are such that downloading 500 widely-available images has virtually no effect on the market. Sadly, the worldwide market for child pornography is so vast that the relative impact of several hundred additional images is minuscule, yet results in a significant increase in the guideline range.") (internal quotation and citation omitted); *United States v. Raby*, 2009 WL 5173964, at **6-7 (S.D. W. Va. Dec. 30, 2009) ("The worldwide market for child pornography is so vast that the relative market impact of having even 592 additional images is minuscule.").

> ### 3) *The Mistaken Belief That Punishing Possessors Of Child Pornography Will Deter The Commission Of Child Pornography Offenses*

Congress has also relied on the view that severe penalties will deter others from possessing child pornography. In support of criminalizing the possession of child pornography, Senator Thurmond said that "tough penalties . . . will be a deterrent to those who would sexually exploit children." 136 Cong. Rec. S9029 (June 28, 1990). The Sixth Circuit, referring to Congress's actions over the years with regard to child pornography offenses, said it is "clear" that Congress was interested in "deterrence" whenever it acted to increase the guideline range. *United States v. Bistline*, 665 F.3d 758, 764 (6th Cir. 2012). But to the extent that Congress believed that increasing penalties will deter others from possessing child pornography, it was mistaken. As shown in the preceding section, empirical research is unanimous that more severe sentences do not decrease the likelihood that others will commit crimes.

To the extent that Congress meant to deter child pornography possessors themselves from committing further crimes, all the empirical research is in agreement that imprisonment does not reduce recidivism. *See, e.g.*, Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011) ("The results indicate that incarceration did not affect either offenders' likelihood of recidivating or the severity of recidivism."); Howard E. Barbaree *et al.*, *Canadian Psychological Association Submission to the Senate Standing Senate Committee on Legal and Constitutional Affairs* 6 (Jan. 2012) ("Psychology researchers have identified effective methods, or 'what works,' to reduce crime – the overwhelming consensus of the literature is that treatment works, incarceration does not."). As Judge Roger Warren, President Emeritus of the National Center for State Courts, stated in 2007: "The research evidence is unequivocal that incarceration does not reduce offender recidivism." Roger Warren, National Center for State Courts, *Evidence-Based Practice to Reduce Recidivism:*

*Implications for State Judiciaries* 11 (2007).[7]  Instead, "[i]ncarceration actually results in slightly increased rates of offender recidivism." *Id.*  In other words, "across the offender population, imprisonment does not have special powers in persuading the wayward to go straight. To the extent that prisons are used because of the belief that they reduce reoffending more than other penalty options, then this policy is unjustified." Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) ("[H]aving pulled together the best available evidence, we have been persuaded that *prisons do not reduce recidivism more than noncustodial sanctions*.").  As for why this is so, the Commission and scholars have identified numerous "criminogenic" effects of incarceration, including that prison serves as a school for criminals; severs ties to family and community; diminishes employment options upon release; and reduces rather than increases the inmate's willingness or ability to conform to social norms.[8]

Instead, treatment works. The Commission reports that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" *Child Porn Report* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

---

[7] *Available at* https://www.wicourts.gov/courts/programs/docs/cjijudicialpaperfinal.pdf.

[8] *See generally* Martin H. Pritikin, *Is Prison Increasing Crime*, 2008 Wis. L. Rev. 1049, 1054-72 (cataloging eighteen criminogenic effects of incarceration); Lynne M. Vieraitis, Tomaslav V. Kovandzic, & Thomas B. Marvel, *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Pub. Pol'y 589, 614-16 (2007); *see also* U.S. Sent'g Comm'n, Staff Discussion Paper, Sentencing Options under the Guidelines 19 (1996) (recognizing imprisonment has criminogenic effects, including contact with more serious offenders, disruption of legal employment, and weakening of family ties).

In sum, each of Congress's actions rested on unfounded assumptions. As the Commission has noted, congressional directives "creat[e] anomalies in the guidelines structure" and "new sentencing disparities," and "are potentially in tension with the fundamental Sentencing Reform Act objectives of delegating to an independent, expert body in the judicial branch of the government the finer details of formulating sentencing policy and revising that policy in light of actual court sentencing experience over time." U.S. Sent'g Comm'n, *Mandatory Minimum Penalties in the Federal Criminal Justice System* 122-23 (1991). Yet, as shown next, the relevant amendments promulgated by the Commission by its own choice were also without empirical support.

### c. Enhancements That Apply In Nearly Every Case Do Not Serve Their Purpose

The enhancements for material involving prepubescent minors, use of a computer, and number of images apply in nearly every case sentenced under § 2G2.2. In fiscal year 2020, 93.6% of defendants received the 2-level enhancement for material involving prepubescent minors; 94.2% received the 2-level enhancement for use of a computer;" and 93.6% received at least a 2-level enhancement based on the number of images, with most (73%) receiving the 5-level enhancement for 600 images or more. *U.S. Sent'g Comm'n, Use of Guidelines and Specific Offense Characteristics* (2020)[9].  According to the U.S. Sentencing Commission's June 2021 report "Federal Sentencing of Child Pornography: Non-production offenses," 84% of non-production offenses applied the enhancements for images depicting sadistic or masochistic conduct or abuse of an infant or toddler, each of which carries a 4-level enhancement.[10]

---

[9] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/Use_of_SOC_Guideline_Based.pdf
[10] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf (pg. 4)

These circumstances thus describe conduct that is "essentially inherent to the crime itself," not aggravating factors describing a more serious offense or higher risk of harm. *Kelly*, 868 F. Supp. 2d at 1208-09. As the Sixth Circuit has recognized, enhancements that apply in "almost every case" are contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense." *Robinson*, 669 F.3d at 778 (discussing the enhancement for "use of a computer"). Such enhancements render § 2G2.2 an "anomaly." *Id.* The Sentencing Commission confirms that "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *Id.* at 316, so that the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *Id.* at 323. Because the enhancements for computer use, type, and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Child Porn Report* at ii, xi, 209, 323.

In sum, the guidelines under USSG § 2G2.2 have become divorced from their stated purpose. Time and again, Congress and the Commission relied on mistaken beliefs to increase the guidelines. The result is a guideline that is so disconnected from current evidence and the national experience that most judges find even the lower guidelines unduly harsh and inconsistent with the statutory purpose of § 3553.

## IV.     18 U.S.C. § 3553(A) FACTORS

### A.  The Nature and Circumstances of the Offense.

Mr. Blanco's involvement in the instant offense is extraordinarily regrettable. As stated during his presentence interview, "I just want to better myself. I need help so that I can see my family and friends again. I want to return to a normal, healthy life." *See* PSR at ¶ 30. Mr. Blanco

described in a letter to this Court the ways in which this case transformed his perception of his actions. *See* Exhibit A. "Throught these two years, I began to realize that my actions of viewing child pornography brought me into a path of destruction." *Id.*. He acknowledges that pornography "inhibited" his decision-making skills, and he recognizes that he victimized people as a result of his conduct in this case.

In Mr. Blanco's letter to the Court, he states, "I acknowledge that my actions are self-destructive, dangerous, and inappropriate to the community … [s]ince the beginning of my case, I have been receiving therapy to be treated for my actions." *Id.*Mr. Blanco then detailed a series of apologies to those affected by his actions in this case. Addressing the victims of his voyeuristic actions, he states, "I am sorry for recording videos of you using the bathroom." *Id.* To the hundreds of "child victims and their families," he states, "I am sorry for storing inappropriate videos and images of you in my computer." *Id.* Lastly, he apologized to his family "for the pain and suffering" he caused them throughout the years. *Id.*

Mr. Blanco's case is particularly complex due to his diagnoses of ███████████ ██████████████████ government argues in its sentencing papers that, "[d]espite all of the support and opportunities, this Defendant has engaged in a disturbing pattern of accessing, downloading, viewing, and possessing images and videos depicting the sexual abuse of children." *See* Dkt. No. 31, p. 6. The government is correct in this regard, that despite the strong familial support Mr. Blanco enjoyed growing up, he still engaged in inappropriate conduct. It must be emphasized, however that Mr. Blanco's conditions inevitably affected his ability to control his impulses. ████████████████████████████████████████ ████████████████████████████████

The government argued that this Court should consider the deterrence of Mr. Blanco and other offenders when considering an appropriate sentence to impose in this case, "… a lengthier sentence and period of supervised release is necessary [to] afford adequate deterrence to this Defendant, and to other like-minded offenders…" *See* Dkt. No. 31, p. 12. The government fails to acknowledge, however, that the facts pertinent to Mr. Blanco and this case are unique and must be treated as such. In fact, the government does not mention Mr. Blanco's ██████ at all. Given his vulnerabilities, this Court's sentence should reflect how difficult a carceral environment is and will continue to be for Mr. Blanco, especially considering the risks of facilities being ill equipped to address the unique needs of someone with autism. The most effective means of deterrence should come in the form of sex offender intervention, treatment, and rehabilitation. If this Court sentences Mr. Blanco to a lengthy term of incarceration, the punishment could not only subject him to further mental and physical harm, but it would also fail to address or remedy the underlying issues that brought Mr. Blanco before it. In prioritizing rehabilitation over an excessively punitive sentence of incarceration, this Court would effectively promote a decreased risk of recidivism. A community-based sex offender intervention program would help achieve this.

Mr. Blanco is a young and intelligent man ████████████████████████████ ████████████████████████. He now understands the severity of his actions, has taken actionable steps to ensure his risk of recidivism is low, and he is hopeful to return to his loving family and community.

[redacted]

[redacted]

[redacted]

[redacted]

[REDACTED]

**C.  Mr. Blanco's History and Characteristics.**

Mr. Blanco's young age, both now and when he first began viewing child pornography, bears particular significance for the Court's consideration in fashioning an appropriate sentence. As stated above, Mr. Blanco was only 14 years old when he first began viewing child pornography.  Courts have consistently looked to a defendant's young age at the time of his involvement in imposing below-Guideline or probationary sentences in child pornography cases. *See, e.g., United States v. Polito*, 215 F. App'x 354, 357 (5th Cir. 2007) (per curiam) (upholding a sentence of probation when use began during adolescence); *United States v. Stern*, 590 F. Supp. 2d 945, 952-53 (N.D. Ohio 2008) (imposing a sentence of one year and one day in

possession of child pornography case, where defendant was 14 years old at the time he began viewing child pornography); *see also Gall v. United States*, 552 U.S. 38 (2007) ("[Y]outh is more than a chronological fact. It is a time and condition of life when a persona may be most susceptible to influence and psychological damage."). As the Supreme Court has explained:

> [A] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young.... Even the normal 16-year old customarily lacks the maturity of an adult. It has been noted that adolescents are overrepresented statistically in virtually every category of reckless behavior....[J]uveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. This is explained in part by the prevailing circumstances that juveniles have less control, or less experience with control, over their own environment... [T]he character of a juvenile is not as well formed as that of an adult. The personality traits are more transitory, less fixed.

*Roper v. Simmons*, 543 U.S. 661, 570 (2005).

When Mr. Blanco was eight (8) years old, he was ███████████████████ ████████████████████████████████████████████████ *See* PSR at ¶67. In 2018, Mr. Blanco was ████████████████████████████████████████████████████████ ███████████ *Id.* at ¶ 68. He reported that he has never intentionally consumed an illicit substance, although, during his incarceration in this case, he was "drugged" by other inmates who sought to take his food. *Id.* at 72.

Mr. Blanco completed some college studying political science at American University in Washington, D.C. from 2021 to 2022. *Id.* at 60. Following his ███████████████ ██████████████ in March of 2022, Mr. Blanco moved to his parents' home in Orlando, Florida to assist his mother in caring for his father. *Id*. at ¶ 55 and 60. Mr. Blanco transferred to Keiser University in Orlando and began pursuing a career in nursing so that he can care for his father. *See* PSR ¶ at 74 and Exhibit D.

Simply put, Mr. Blanco is beloved by his family, friends, and former colleagues, evident by the six (6) various letters of support submitted as part of this memorandum on his behalf. *See* Exhibits B-G. The letters paint a picture of a man who is well respected, loved, and admired for his dedication to his family, his work, and his kindness. *Id*.

Maria and Larry Blanco, Mr. Blanco's parents, expressed in their letter to the Court remorse for the victims in this case. *See* Exhibit B. Citing the traumatic experiences Mr. Blanco experienced while incarcerated thus far, his parents believe that "God saved him and he promised God that he will be a good person and will never do such behavior again." *Id.* They added that "God put him there to be disciplined." *Id*.

Despite his ███████████████████████████████, Mr. Blanco excelled in school, joined a church faith formation class, and was involved in the Boy Scouts growing up. *Id*. He was always deeply loved and supported by his parents and grandparents, all of whom lived and spent a lot of time with Mr. Blanco. *Id*. Yet, as his parents describe, Mr. Blanco is not perfect. *Id*. "He is very curious which led him to illegal site[s] [on the] internet." *Id*. Still, his parents affirm that Mr. Blanco "grew up with faith in God," and that he "will not harm anybody including children." *Id*. Mr. Blanco's parents ultimately ask this Court to give him "a chance to go back home" to their family. *Id*.

Mike Baker, a long-time friend of Mr. Blanco and his family also submitted a letter of support. *See* Exhibit C. Mr. Baker is the Director of Faith Formation at St. Isaac Jogues Catholic Church and first met the Blanco family when they joined his parish in 2009. *Id*. Mr. Baker recalls that for many years, Mr. Blanco was very active in their Parish Religious Education Classes, and in the Boy Scout Troop, including holding various leadership roles. *Id*. Mr. Baker proudly stated that Mr. Blanco "was very good at teaching" and assisting the new members as they joined the

Troop. *Id.* He expressed feeling blessed to work with and share a long-term friendship with Mr. Blanco and his family. *Id.*

Sunny Jacob is a family-friend of Mr. Blanco, and met him in the Boy Scouts Troop when they were really young. *See* Exhibit D. Mr. Jacob always knew Mr. Blanco to be "honest and caring since the day [he] met him," adding that he was always "very knowledgeable," "always a joy to talk to," and he "would always stay away from trouble." *Id.* Mr. Jacob believes his friend to be reliable and loyal, "[h]e… never says no if you need help. He has been there for all his friends and family at a moment's notice… His concern for others is astonishing." *Id.* Mr. Jacob respectfully requests that this Court consider these positive qualities when determining its sentence. *Id.*

Mr. Blanco's uncle, William Villanueva, described that Mr. Blanco was raised by his parents to be "obedient, respectful, loving, caring and God-fearing." *See* Exhibit E. In describing Mr. Blanco's determination, Mr. Villanueva stated, "Kyle is really an achiever," and he has "high expectations for a bright future for Kyle to become a successful Professional in chosen course of degree in college education." *Id.* Mr. Villanueva prays for and respectfully petitions your Honor for "sympathy, heartfelt consideration, generosity, and clemency" in sentencing. *Id.* Oscar and Nanette Del Rosario also open their letter asking for this Court's "leniency and compassion" for their nephew. *See* Exhibit F. The Del Rosarios described how loved Mr. Blanco was growing up. *Id.* They recount that his parents "showered him with love and affection" and his grandparents "nurtured him to be a good person." *Id.* They lastly reiterate the qualities mentioned in other character letters, that Mr. Blanco is "a loving, thoughtful and caring person." *Id.* Similarly, Daryll Villanueva, who is Mr. Blanco's older cousin, describes Mr. Blanco as a "very smart and loving kid" who was "very helpful and respectful." *See* Exhibit G. Mr. Villanueva respectfully asks this

Court to give him a chance and consider "how committed he is to the community and his family." *Id.*

It is clear from the people who have known Mr. Blanco that he is a loving, caring, determined, and intelligent young man, with the community support needed to hold him accountable to the process of ███████████████████. Now, unlike before his arrest, Mr. Blanco has the attention and support of his community, and he will no longer be left to navigate his challenges alone. He is a bright and well-loved man who made terrible decisions, for which he took responsibility, and he is deserving of this Court's leniency.

**D. Mr. Blanco Risk of Recidivism.**

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. And because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "there is no correlation between recidivism and Guidelines' offense level.  Whether an offender has a low or high guideline offense level, recidivism rates are similar.  While surprising at first glance, this finding should be expected as the Guidelines' offense level has long been recognized as not intended or designed to predict recidivism."  *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*).  Thus, the guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C).  Accordingly, *Booker* has freed the judiciary to remedy this inconsistency.

23

In addition to what has already been described about Mr. Blanco's character and willingness to obtain proper treatment, the Commission has also objectively quantified his low likelihood of recidivism. For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as educational attainment increases. *See Measuring Recidivism* at 12. More specifically with respect to Mr. Blanco, who has attended some college and has a criminal history category of I, the recidivism rate is only 13.9 %. *Id.* at 28. It is unfortunate that the Guidelines' offense levels do not take into consideration such data. This data exists yet is not utilized to inform the Commission's rulemaking.

### E.  18 U.S.C. § 3553 (a)(6) – Avoiding Unwarranted Sentencing Disparities

An additional factor to consider is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In June 2021, the United States Sentencing Commission ("USSC") released a report on sentencing for non-production child pornography offenses.[11] In its report, the USSC made key findings related to the current issues involving those convicted of non-production child pornography offenses. *Id*. The USSC found that advancements in digital and mobile technology have led to increasingly voluminous quantities of videos and images that are graphic in nature, often involving the youngest victims, in the majority of non-production offenses. *Id.* at 10. More importantly, the USSC found that four of the six sentencing enhancements in §2G2.2 cover conduct that has become so ubiquitous with non-production offenses, that they are applied in the vast majority of cases. *Id*. Since these enhancements, intended to target more serious and more culpable offenders, now apply in most cases, the average guideline minimum in non-production offenses has increased from 98 months in 2005 to 136 months in 2019. *Id.* at 11. The courts have

---

[11] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf

reacted accordingly by imposing downward variances in typical non-production child pornography cases, and in 2019, the majority (59%) of non-production sentences received a variance below the guideline range. *Id.* The increase in sentencing guidelines coupled with the increase in deviation from those guidelines has resulted in massive sentencing disparities among similarly situated non-production offenders. For example, the sentences of 190 similarly situated distribution offenders ranged from less than a month to 240 months, even though those 190 offenders had the same guideline calculation through the application of the same specific offense characteristics and criminal history category. *Id.* at 64. The average sentence for a common distribution offender is 100 months, with the overwhelming majority (85.8%) sentenced below the guideline range. *Id.* at 64.

A review of comparable cases in this District and elsewhere demonstrate that sentencing Mr. Blanco to the nearly ten (10) months of incarceration he has served thus far is a sufficient, but not greater than necessary sentence in this case.

In *United States v. Hawkins*, 13-cr-244 (KBJ), Mr. Hawkins, who was a similar age to Mr. Blanco at the time of his arrest, faced a voluntary guidelines range of 97 – 121 months incarceration following his guilty plea to Possession of Child Pornography, which included sentencing enhancements nearly identical to those in Mr. Blanco's case.  Judge Ketanji Brown Jackson sentenced Mr. Hawkins to three (3) months incarceration, noting in the judgment order his "young age (19), the need for him to be close to family, and this Court's finding that he is particularly vulnerable to abuse while incarcerated." *See* Exhibit I.

Another case to consider in this jurisdiction is *United States v. Parker* No. 1:17-cr-00047. In *Parker*, the defendant maintained a P2P file sharing client on his computer, which other users could access to download child pornography stored on the defendant's device. An undercover

officer accessed Mr. Parker's P2P client and downloaded several videos depicting child pornography. In addition, a search of Mr. Parker's premises recovered computers containing over 2000 images of child pornography and uncovered unregistered firearms and ammunition. *Id*. at ECF No. 48. The difference is that Mr. Parker pleaded guilty to *possession* of child pornography and possession of unregistered firearms, which resulted in an offense level of 26 and a guideline range of 63 to 78 months. *Id*. Judge Sullivan sentenced Mr. Parker to 36 months. *Id*. at ECF No. 63.

In *United States v. Moreira*, 10-cr-002 (ESH), a possession case, the defendant used peer-to-peer software to share files with an undercover law enforcement agent. When the defendant was arrested, law enforcement found over 800 images and 5 videos of child pornography, including images of prepubescent children, in the defendant's possession. While Mr. Moreira's Guidelines range was 78 to 97 months, the Court sentenced him to 60 months' probation with 60 days incarceration to be served on weekends.

In *United States v. Malakoff*, Cr. No. 09-cr-0051 (ESH), a case involving a charge for possession of child pornography, Judge Huvelle sentenced Mr. Malakoff, a 47-year old adult male, to five years' probation. The advisory Guidelines range was 78-97 months. As with the instant case, Malakoff involved both pornographic photos and videos. Yet based upon the other Section 3553 factors, such as Mr. Malakoff's lack of any other criminal record, a childhood sexual trauma, the punishment already inflicted by the conviction and sex offender registration requirement, and Mr. Malakoff's deep roots in the community, the Court sentenced Mr. Malakoff to no prison time at all, but rather five years' probation.

In *United States v. Rowan*, 09-cr-225 (RMU), with a guidelines range of 97 to 120 months, the defendant was sentenced to 24 months' imprisonment with 180 months of supervised release.

Although the defendant was only charged with possession, the Statement of Facts accompanying his plea agreement indicate that the defendant distributed 16 images to an undercover officer through peer-to-peer computer software. Upon investigation, 826 images of child pornography were found in the defendant's possession, including images of infants and toddlers.

One contrasting example from the District of Columbia Circuit Court of Appeals can be found in *United States v. Fry*, 851 F. 3d 1329 (2017). In *Fry*, the defendant offered to send an undercover agent forty videos of child pornography in exchange for watching the agent abuse his eight-year-old daughter via webcam. *Id.* at 2. A search warrant executed at Mr. Fry's home recovered over 600 images of child pornography, including "depictions of prepubescent children engaged in sadomasochistic sex acts." *Id.* He pleaded guilty and agreed that the applicable estimate in the Guidelines range was 97 to 121 months. *Id.* at 3. Mr. Fry was sentenced to 108 months of imprisonment followed by 120 months of supervised release. The court likened these facts more so to "bartering" than just simply possessing the material, thus the offense would have created a "new victim." *Id.* at 5.

Another contrasting example from the District of Columbia Circuit Court of Appeals is *United States v. Accardi,* 669 F.3d 340 (2012), where the defendant told an MPD Detective online that he was interested in children "from baby on up." *Id.* at 2. The defendant thereafter sent the detective thirteen images of adult men sexually engaging with prepubescent children. *Id.* Following a search warrant that recovered thousands of images of children engaged in sexual contacts with adults. He was charged with transportation and possession of child pornography and pleaded guilty to both charges. *Id.* The District Court sentenced the defendant to concurrent terms of 100 months' incarceration in each count, along with 40 years of supervised release. *Id.*

Mr. Blanco's guideline calculation is disproportionately high given the actual nature and circumstances of the offense. He is a young man pursuing his education and career, this is his first offense, he expressed deep remorse for this regrettable offense and the victims he affected, and he has taken actionable steps toward bettering himself. Mr. Blanco did not create any new content or express any interest in wanting to meet to commit sexual abuse. He downloaded images already available in the peer-to-peer network and provided access to the files through the network. This by no mean diminishes the seriousness of Mr. Blanco's crime, however, it does provide important context for the Court to consider in fashioning a sentence. A sentence similar to those imposed in *Fry* and *Accardi* is too harsh to apply here. Moreover, as the study suggests, these enhancements are resulting in disproportionate sentences for similarly situated defendants. Mr. Blanco's sentence should reflect his actual conduct, and he is deserving of a sentence below the sentencing guidelines in this case.

Accordingly, Mr. Blanco, by and through undersigned counsel, respectfully requests that the Court sentence him to a sentence of time served followed by supervised release with special conditions to include psychosocial intervention programs.

Respectfully submitted,

_____/s/_____
Rammy G. Barbari
D.C. Bar No. 1032106
Price Benowitz, LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
(202) 417-6000
rammy@pricebenowitz.com
*Counsel for Kyle Blanco*

28

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of March 2024, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via ECF to all parties in this matter.

_____/s/_____
Rammy G. Barbari